### UNITED STATES DISTRICT COURT
### DISTRICT OF SOUTH CAROLINA
### GREENVILLE DIVISION

| | |
|---|---|
| Webber Ventures, LLC, | |
| Plaintiff, | C.A. No. _____ |
| vs. | |
| Sentinel Insurance Company, Limited, | **COMPLAINT** |
| Defendant. | **(Jury Trial Demanded)** |

The Plaintiff Webber Ventures, LLC ("Webber"), complaining of the Defendant Sentinel Insurance Company, Limited ("Sentinel"), would respectfully allege and show unto the Court as follows:

**PARTIES AND JURISDICTION**

1.      Webber is a South Carolina limited liability company with its principal place of business in Greenville County, South Carolina.

2.      Upon information and belief, Sentinel is an insurance company incorporated under the laws of Connecticut with its principal place of business in Connecticut and is a citizen of Connecticut.

3.      This Court has personal jurisdiction over Sentinel by virtue of its contracting to insure any person, property, or risk located within this State at the time of contracting.

4.      This Court has subject matter jurisdiction over the matter of this action on the grounds of 28 U.S.C. § 1332, this being a civil action between citizens of different states in which the amount in controversy exceeds seventy-five ($75,000.00) exclusive of interest and costs.

5.      Venue of this action lies in the United States District Court for the District of South Carolina, Greenville Division because the damaged property at issue is located in Greenville, South Carolina.

## GENERAL ALLEGATIONS

6.      Sentinel and Webber are parties to The Hartford Sentinel Building Owner's Policy No. 22 SBA UP4648 with effective dates 12/29/2019 to 12/28/2020 (and other applicable policies and/or years) ("Policy").

7.      A true and correct copy of the Policy is attached as <u>Exhibit 1.</u>

8.      Webber is the Insured under the Policy.

9.      On or about August 18, 2020, Webber made a claim under the Policy ("8.18.20 Claim Letter") for hail damage incurred on June 1, 2020, to its building located at 5201 Pelham Road, Greenville, SC 29615 ("Building").

10.     A true and correct copy of the 8.18.20 Claim Letter is attached as <u>Exhibit 2</u>.

11.     Sentinel assigned Claim Number CP0018831402 to Webber's claim ("Claim").

12.     Sentinel determined that the Building was most likely impacted by a hail storm occurring on May 24, 2020.

13.     Sentinel retained Hancock Consulting, HVAC Investigators, and HiMark Roof Consulting, Inc. ("HiMark") to investigate damage to the Building.

14.     Hancock Consulting noted hail impacts to all rooftop HVAC units, exhaust caps, and metal edge caps.

15.     HVAC Investigators found all 24 HVAC systems had sustained hail related damage.

16.     HVAC Investigators found all 24 HVAC systems required some form of repair.

17.     At an inspection on or about September 3, 2020, HiMark found dents on the cooling fins of the HVAC units caused by the hail.

18.     The roofing system includes 60 mil TPO membrane over polyisocyanurate (polyiso) insulation boards, each with a laminated paper facer (collectively, the "Roofing System").

19.     The 60 mil TPO membrane is reinforced with an internal layer of reinforcing material, or scrim, made of chemically bonded fibers.

20.     The Roofing System incurred physical damage caused by the hail impact, including indentions in the polyiso insulation boards, tears in the facer to the polyiso insulation boards ("facer paper fracture" or "FPF"), and indentions and deformation/stretching of the TPO membrane and embedded scrim.

21.     At an inspection on or about September 3, 2020, HiMark found 1/8 inch indentions in the polyiso insulation boards caused by the hail ("Insulation Board Indentions").

22.     At an inspection on or about September 3, 2020, HiMark found breaks in the facer of the insulation boards caused by the hail ("Insulation Board Facer Breaks" or "FPF").

23.     HiMark included the above findings (set forth in Paragraphs 17, 21, and 22) in its report issued September 13, 2020 ("HiMark Investigation Report").

24.     A true and correct copy of the HiMark Investigation Report is attached as Exhibit 3.

25.     Webber retained National Public Adjusting, LLC ("NPA") to assist it with asserting its Claim.

26. On or about October 15, 2020 ("Sentinel 10.15.20 Letter"), Sentinel issued a letter to NPA admitting that the Insulation Board Indentions and Insulation Board Facer Breaks were caused by the hail.

27. A true and correct copy of the Sentinel 10.15.20 Letter is attached as Exhibit 4.

28. The Policy provides coverage for "direct physical loss of or physical damage to Covered Property," which was quoted in the Sentinel 10.15.20 Letter.

29. In the Sentinel 10.15.20 Letter, Sentinel admitted that the damage to the HVAC systems was covered by the Policy and estimated the repair cost at $49,549.33 for replacement cost value and $37,343.30 for actual cost value.

30. In the Sentinel 10.15.20 Letter, Sentinel denied coverage for the hail damage to the Roofing System on the purported basis that "there is no physical loss" under the Policy language because the damage to the Roofing System was inconsequential, did not reduce the R-value of the insulation, and/or did not affect the insulation's ability to perform its intended function.

31. On or about November 14, 2020, NPA issued a revised loss estimate to Sentinel in the amount of $2,315,635.43 ("Revised Loss Estimate").

32. A true and correct copy of the Revised Loss Estimate is attached as Exhibit 5.

33. NPA and Sentinel agreed upon independent laboratory testing of the Roofing System by PRI Construction Material Technology ("PRI"), and they jointly forwarded two samples of the Roofing System to PRI for testing—one sample that both agreed incurred hail damage and a second control sample that both agreed did not incur hail damage.

34. On or about November 30, 2020, PRI issued a Laboratory Report ("PRI Lab Report") with findings of deformation, or stretching, in the TPO membrane; indentations in the TPO membrane; and a measurable reduction in the hydrostatic resistance in the TPO membrane from 400 psi to 390 psi using ASTM D 751-06 (2011) Standard Test Methods for Coated Fabrics. The PRI Lab Report also noted "Indentation and fracture in ISO facer observed."

35. A true and correct copy of the PRI Lab Report is attached as Exhibit 6.

36. On or about December 18, 2020, NPA issued an email to Sentinel ("NPA 12.18.20 Email") requesting explanation and supporting policy language if the claim is to be denied and also noting that PRI's laboratory testing showed the scrim embedded in the TPO was stretched at hail impact locations.

37. A true and correct copy of the NPA 12.18.20 Email is attached as Exhibit 7.

38. Sentinel retained Doug Van Fleet with JS Held who, on or about January 5, 2021, inspected the exterior façade, mechanicals, parapet capping, and ventilation covers of the Building in order to estimate damages covered by the Policy.

39. JS Held excluded the roof membrane from its inspection.

40. On or about January 15, 2021, JS Held issued a report ("JS Held Report") estimating the damage to the inspected areas caused by the hail to be a total of $259,739.86 for replacement cost value, or $231,025.60 for actual cash value, which did not include the Roofing System.

41. A true and correct copy of the JS Held Report is attached as Exhibit 8.

42. On or about January 20, 2021, Webber issued a letter titled "Appraisal Demand" to Sentinel in which Webber disagreed with Sentinel's actual cash value and requested a review of the enclosed demand estimate.

43. A true and correct copy of the Appraisal Demand is attached as Exhibit 9. The referenced demand estimate is a reference to Exhibit 5.

44. The Appraisal Demand stated that an appraisal is demanded if Sentinel does not agree with Webber's estimate, and it selected Fred Lupfer as the Insured's appraiser.

45. The Appraisal Demand was not actually delivered to Sentinel until February 4, 2021, by email.

46. A true and correct copy of the email delivering the Appraisal Demand is attached as part of Exhibit 10.

47. On or about January 22, 2021, Sentinel issued a letter to NPA ("Sentinel 1.22.21 Letter") in which it cited the Policy language that it pays for "**direct physical loss of or physical damage** to Covered Property" (emphasis by Sentinel) and stated that it retained JS Held to assist in the determination of the supplemental claim for $2,315,635.43; that it reviewed PRI's lab findings, which support its position that the roof membrane was not damaged; that "[t]here is no physical loss to the 60mil TPO or ISO board/facer sheet which requires the replacement or repair of these building components" and that "[m]ore specifically, there is no loss of utility, functionality, integrity, life expectancy, market value or aesthetic quality"; and that it therefore maintained its 10/15/20 coverage position.

48. A true and correct copy of the Sentinel 1.22.21 Letter and associated email is attached as Exhibit 11.

49. The Sentinel 1.22.21 Letter concluded that the Roofing System was not covered because purportedly there was "no physical loss"; however, the Sentinel 1.22.21 Letter failed to address whether or not there was "physical damage" to the Roofing System.

50. The Sentinel 1.22.21 letter offered to pay actual cash value of $231,025.60 per JS Held's report ("Settlement Offer").

51.     The Settlement Offer failed to include the damage to the Roofing System caused by the hail, which is covered under the Policy because there was physical loss and/or physical damage with respect to the Roofing System.

52.     With respect to the damages to the Building that Sentinel admits are covered under the Policy, the Settlement Offer understated the actual amount of damages.

53.     On or about February 4, 2021, Sentinel received Webber's Appraisal Demand.

54.     On or about February 10, 2021, Sentinel issued a letter to Webber in response to the Appraisal Demand ("Sentinel 2.10.21 Letter") finding that $1,958,933.87 of its claim for $2,315,635.43 was outside of the scope of coverage and that there is no coverage for the roof membrane and also asserting that Hartford opposed any effort to include the roof membrane in the appraisal process; Sentinel also identified a difference of $96,961.70 on the agreed upon scope as subject to appraisal and named Doug Van Fleet with JS Held as Sentinel's appraiser.

55.     A true and correct copy of the Sentinel 2.10.21 Letter is attached as Exhibit 12.

56.     On or about February 12, 2021, NPA issued a letter to Sentinel ("NPA 2.12.21 Letter") noting that Webber will move forward in appraising all damages from the loss; that Sentinel previously conceded that "these indentions and breaks [in the insulation board] were caused by the hail impact"; that Sentinel has not pointed to any policy language excluding the damage Sentinel acknowledged with respect to the insulation board and facer; and that Webber rejected Doug Van Fleet as not being impartial due to his prior involvement.

57.     A true and correct copy of the NPA 2.12.21 Letter is attached as Exhibit 13.

58.	On or about February 17, 2021, Sentinel issued a letter to NPA ("Sentinel 2.17.21 Letter") naming Francis Cain with JS Held as Sentinel's appraiser; stating that the appraisal process is to evaluate loss and not address the scope of coverage; reiterating its coverage position remains unchanged that the roof membrane is not covered because there was "no loss of utility, functionality, integrity, life expectancy, market value or aesthetic quality"; and asserting that "[t]he appraisers should have a detailed and itemized estimate completed so any coverage limitations and exclusions may be appropriately applied."

59.	A true and correct copy of the Sentinel 2.17.21 Letter and associated emails are attached as Exhibit 14.

60.	On or about February 22, 2021, Fred Lupfer issued an email to Sentinel rejecting Francis Cain as appraiser because he works for the same company, JS Held, as Doug Van Fleet.

61.	On or about February 22, 2021, Sentinel issued an email to Fred Lupfer naming Rob Coleman as Sentinel's appraiser.

62.	On or about March 1, 2021, Fred Lupfer issued an email to Rob Coleman proposing an umpire list.

63.	On or about March 15, 2021, Rob Coleman issued an email to Fred Lupfer rejecting his umpire list and proposing a different umpire.

64.	On or about March 17, 2021, Rob Coleman issued an email to Fred Lupfer proposing a second umpire.

65.	On or about March 22, 2021, Fred Lupfer issued an email to Rob Coleman requesting his position on the roofing components and proposing that they address and account for all damage including the roofing system.

66. On or about March 23, 2021, an on-site inspection was performed by Fred Lupfer and Rob Coleman.

67. On or about April 7, 2021, Rob Coleman issued an email to Fred Lupfer asking about approval of his prior proposed umpires.

68. On or about April 7, 2021, Fred Lupfer issued an email to Rob Coleman that he could not accept the proposed umpires and inquiring if he had developed his position yet.

69. On or about April 8, 2021, Rob Coleman issued an email to Fred Lupfer that his position is that he is mostly in agreement with Sentinel as to the amount of the loss and asking about other umpire candidates.

70. On or about April 20, 2021, Fred Lupfer issued an email to Rob Coleman proposing Wesley Barber as umpire.

71. On or about April 27, 2021, Rob Coleman issued an email to Fred Lupfer declining Wesley Barber as an umpire and proposing other umpires.

72. On or about May 27 and June 4, 2021, Rob Coleman issued emails to Fred Lupfer inquiring whether his proposed umpires were acceptable.

73. On or about July 22, 2021, Fred Lupfer issued an email to Rob Coleman providing three additional umpires for consideration.

74. On or about July 22, 2021, Fred Lupfer issued an email to Rob Coleman again requesting his position.

75. On or about July 26, 2021, Rob Coleman issued an email to Fred Lupfer requesting additional information concerning his three proposed umpires.

76. On or about August 4, 2021, Rob Coleman issued an email to Fred Lupfer stating that he had not yet written a separate position (estimate) and that he would agree to the RCV

and ACV amounts ($259,739.86 and $231,025.60, respectively) previously agreed to by The Hartford, but that a discussion of the scope of repair was a different conversation.

77. On or about August 4, 2021, Fred Lupfer issued an email to Rob Coleman inquiring if he had reviewed the additional three proposed umpires.

78. On or about August 5, 2021, Rob Coleman issued an email to Fred Lupfer declining the three proposed umpires and indicating it did not look like the parties could reach mutual agreement upon an umpire.

79. A true and correct copy of the emails set forth in Paragraphs 60-65 and 67-78 above are attached as Exhibit 15.

80. On or about May 25, 2021, Fred Lupfer estimated the damages to the Building caused by the hail, including the Roofing System, as totaling $3,589,362.62 for replacement cash value and $3,386,092.89 for actual cash value.

81. A true and correct copy of Fred Lupfer's estimate is attached as Exhibit 16.

82. On or about July 29, 2021, a joint Storm Damage Evaluation report was issued by Forensic Building Science, Inc. and RJH & Associates, Inc. with respect to the Roofing System ("Engineering Report").

83. A true and correct copy of the Engineering Report is attached as Exhibit 17.

84. The Engineering Report concluded that the Roofing System was engineered to provide protection from fire, flame spread, and smoke and that FPF damage and other damage to the Roofing System resulted in the Roofing System not being in compliance with approved fire resistance required by the International Building Code, which applies to the subject Building.

85. On or about August 7, 2021, NPA emailed the Engineering Report to Sentinel and requested Sentinel reconsider its denial of coverage for the Roofing System ("8.7.21 Request to Reconsider").

86. A true and correct copy of the 8.7.21 Request to Reconsider is attached as Exhibit 18.

87. The Engineering Report provided supplemental evidence of "physical loss" and "physical injury" to the Building (in addition to the evidence of physical loss and physical injury previously provided).

88. Sentinel received the Engineering Report on or about August 7, 2021; however, as of August 10, 2021, Sentinel had not responded to the 8.7.21 Request to Reconsider.

89. The Roofing System suffered physical damage caused by the hail, and therefore this damage is covered by the Policy.

90. The Roofing System suffered physical loss caused by the hail, and therefore this loss is covered by the Policy.

91. The Roofing System suffered physical loss and/or physical damage from the hail due to the indentions, tears, fractures, and/or FPFs in components of the Roofing System; due to deformation, or stretching, in the TPO membrane; due to a measurable reduction in the hydrostatic resistance in the TPO membrane from 400 psi to 390 psi using ASTM D 751-06 (2011) Standard Test Methods for Coated Fabrics; due to cosmetic or other damage; due to falling out of compliance with the approved fire resistance required by the International Building Code; due to a reduction of the R-value of the insulation; due to a reduction of the insulation's ability to perform its intended function; and/or due to a loss of utility, functionality, integrity, life expectancy, market value, and/or aesthetic quality of the Roofing System and/or its components ("Roofing System Damage").

92.     The Roofing System Damage constitutes physical loss and/or physical damage under the Policy and was within the scope of coverage under the Policy.

93.     The Roofing System Damage constitutes physical loss and/or physical damage under the Policy and was within the scope of coverage under the Policy regardless of whether the Roofing System Damage was inconsequential; regardless of whether the R-value of the insulation was reduced; regardless of whether the damage affected the insulation's ability to perform its intended function; and regardless of whether or not there was loss of utility, functionality, integrity, life expectancy, market value, or aesthetic quality.

94.     In any event, (a) the Roofing System Damage was consequential; (b) the R-value of the insulation was reduced; (c) the damage affected the insulation's ability to perform its intended function, and (d) there was loss of (i) utility, (ii) functionality, (iii) integrity, (iv) life expectancy, (v) market value, and (vi) aesthetic quality.

95.     Accordingly, the damage to the Building caused by the hail, including the Roofing System Damage, was within the scope of coverage, and the Policy does not contain any applicable limitations or exclusions to coverage.

96.     The Policy does not contain a "cosmetic exclusion" to coverage, and so even if the Roofing System Damage (or other damage to the Building) might be considered cosmetic, it nonetheless is not excluded from coverage.

97.     Upon information and belief, Sentinel can and does issue insurance policies that include cosmetic exclusions.

**FOR A FIRST CAUSE OF ACTION**
**(Breach of Contract)**

98.     The foregoing allegations are hereby incorporated by reference.

99.     Webber was the Insured under the Policy issued by Sentinel that was in effect when the hail damage occurred.

100. Webber gave timely notice of its claim to Sentinel and has otherwise complied with all provisions of the Policy.

101. The damage caused to the Building by the hail (both the Roofing System Damage and any other damage) is covered under the Policy for the value of the physically lost or physically damaged property as set forth in the Claim.

102. The "Special Property Coverage Form" (the "SPCF") within the Policy provides Coverage as follows: "A. Coverage. We will pay for direct physical loss of or physical damage to Covered Property at the premises described in the Declarations (also called 'scheduled premises' in this policy) caused by or resulting from a Covered Cause of Loss."

103. The "premises described in the Declarations" (quoted from Section A of the SPCF) is the Building located at 5201 Pelham Road, Greenville, SC 29615.

104. The Building, including the Roofing System, is "Covered Property" as defined in Section A.1 of the SPCF.

105. The hail damage to the Building (including the Roofing System Damage) as asserted in the Claim, constitutes "direct physical loss of or physical damage to Covered Property."

106. No limitation of the Policy applies to the Claim.

107. No exclusion of the Policy applies to the Claim.

108. Sentinel breached the Policy on or after October 15, 2020, when it denied coverage for the Roofing System Damage.

109. Sentinel breached the Policy on or after October 15, 2020, when it failed to provide coverage for all of the claimed damages to the Building other than the hail damage to the Roofing System ("Other Damage").

110. Sentinel's denial of coverage in the Sentinel 10.15.20 Letter—and its continued denials of coverage in the Sentinel 1.22.21 Letter, Sentinel 2.10.21 Letter, and Sentinel

2.17.21 Letter, as well as its failure to provide coverage following the 8.7.21 Request to Reconsider—and resulting refusal to pay the value of the physically lost or physically damaged property constituted a breach of the Policy.

111. The doctrine of reasonable expectations and the policy and common law of South Carolina requiring insurance contracts to be liberally construed in favor of the insured further support and dictate that the Policy required Sentinel to cover the cost to repair or replace the Roofing System Damage as well as the Other Damage to the Building caused by the hail.

112. Sentinel's failure to provide coverage to Webber in accordance with its reasonable expectations constituted a breach of the Policy.

113. As a result of Sentinel's breach of the Policy, Webber has been deprived of the benefits of the Policy and has sustained damages (including but not limited to the value of the physically lost or physically damaged property in the amount of $3,589,362.62) plus attorneys' fees, expert fees, NPA's fees, appraiser fees, umpire fees, investigation fees, costs, and prejudgment interest in an amount to be established at trial.

### FOR A SECOND CAUSE OF ACTION
**(Bad Faith Denial of Coverage and Processing of Claims)**

114. The foregoing allegations are hereby incorporated by reference.

115. The Policies were mutually binding contracts of insurance between Sentinel and Webber.

116. Sentinel's denial of coverage for the Roofing System Damage and/or denial of coverage for the full claimed amount of the Other Damage was in bad faith as evidenced by its purposely ignoring the physical damage to the Roofing System, purposely ignoring the lack of any exclusion for cosmetic damage, failing to provide a proper basis for its denial, purposely ignoring evidence from experts, failing to provide any countervailing testing, failing to respond to

the 8.7.21 Request to Reconsider, failing to provide coverage following the 8.7.21 Request to Reconsider, and/or retaining experts for the purpose of denying the claim.

117. Sentinel refused to pay benefits under the Policy as a result of its bad faith or unreasonable action in breach of an implied covenant of good faith and fair dealing in the contract that caused damage to the insured.

118. Sentinel had no reasonable grounds to refuse to carry out its obligations under the Policy.

119. Sentinel's refusal to pay the value of the physically lost or physically damaged property constitutes bad faith denial of coverage.

120. Sentinel owed a duty to Webber to process its claim in good faith and to comply with the duty of good faith and fair dealing.

121. Sentinel breached these duties by failing to process the claim of Webber in a reasonable manner, acting in bad faith in the denial and processing of the claim, and failing to provide coverage in accordance with the reasonable expectations of Webber.

122. Sentinel's actions in refusing to fulfill all of its coverage obligations and/or in unreasonably processing Webber's claim constitutes bad faith and/or unreasonable failure to process the claims, which has caused substantial damage to Webber (including but not limited to the value of the physically lost or physically damaged property in the amount of $3,589,362.62) plus attorneys' fees, expert fees, NPA's fees, appraiser fees, umpire fees, investigation fees, costs, and prejudgment interest in an amount to be established at trial.

123. Webber is entitled to punitive damages.

124. Webber is entitled to attorneys' fees under S.C. Code § 38-59-40.

### FOR A THIRD CAUSE OF ACTION
**(Appointment of Umpire)**

125. The foregoing allegations are hereby incorporated by reference.

126. Webber is entitled to the appointment of a competent and impartial umpire pursuant to the Appraisal provision of the Policy (Section E.2 of the Special Property Coverage Form, at p. 20 of 25) ("Appraisal Provision") and pursuant to 9 U.S.C. § 5 providing for the appointment of an umpire by the Court.

127. In the event the insured and insurer disagree on the amount of loss, the Appraisal Provision allows either side to make written demand for appraisal of the loss, in which case each party will select a competent and impartial appraiser who in turn will select an umpire; if the appraisers fail to agree, then they will submit their differences to the umpire, and a decision agreed to by any two will be binding as to the amount of the loss.

128. If the appraisers cannot agree on an umpire, then the Appraisal Provision allows either party to request that selection be made by a judge of a court having jurisdiction.

129. Webber selected Fred Lupfer as its appraiser, and Sentinel selected Rob Coleman as its appraiser.

130. Fred Lupfer and Rob Coleman have been unable to agree as to an umpire.

131. Webber requests the appointment of Wesley Barber as umpire in this matter or, in the alternative, another competent and impartial umpire.

132. Wesley Barber's experience includes Adjuster for Nationwide Insurance (1993 – 1999); Independent Adjuster (1999 – 2015), and Public Adjuster (2016 – Present). He is a Certified Appraiser and Umpire by the Insurance Appraisal and Umpire Association, Inc. and a Certified Appraiser and Umpire by The Property Loss Appraisal Network. He was appointed as an Umpire by a Federal Judge (2019).

133. Webber requests the Court direct the appraisers and umpire to appraise the entire loss to the Building caused by the hail, including but not limited to the Roofing System Damage and Other Damage, with any other coverage issues to be resolved by the Court.

**FOR A FOURTH CAUSE OF ACTION**
**(Declaratory Judgment)**

134.  The foregoing allegations are hereby incorporated by reference.

135.  Pursuant to 28 U.S.C. § 2201 and/or S.C. Code Ann. §§ 15-53-10, *et seq.*, this Court has the power to declare the rights of Webber and Sentinel under the Policy.

136.  Webber and Sentinel are in a dispute concerning the construction and effect of the Policy, including but not limited to the existence of coverage for hail damage to the Roofing System as a result of "physical loss or physical injury" and to the appointment of an umpire.

137.  Accordingly, the Court should hear this matter and declare:

   a. That the Roofing System Damage constitutes "physical loss or physical injury" and is within the scope of coverage under the Policy.

   b. That Sentinel is in material breach of the Policy by its denial of coverage for the Roofing System.

   c. That Sentinel's denial of coverage was in bad faith.

   d. That Sentinel is entitled to the appointment of Wesley Barber as umpire (or, in the alternative, another competent and impartial umpire).

   e. That the appraisers (Lupfer and Coleman) and umpire (to be appointed by the Court) appraise the entire loss to the Building caused by the hail, including but not limited to the Roofing System Damage and Other Damage, with any other coverage issues to be resolved by the Court.

   f. That Webber is entitled to recover reasonable attorneys' fees and costs.

**WHEREFORE**, Webber respectfully requests

(1) a trial by jury;

(2) that the Court enter judgment in favor of Webber and against Sentinel for compensatory and punitive damages, prejudgment interest, expert fees, NPA's fees, appraiser fees, umpire fees, investigation fees, costs, and attorneys' fees and/or for such other and further relief as the Court deems just and proper;

(3) that this Court declare:

 a. That the Roofing System Damage constitutes "physical loss or physical injury" and is within the scope of coverage under the Policy.

 b. That Sentinel is in material breach of the Policy by its denial of coverage for the Roofing System.

 c. That Sentinel's denial of coverage was in bad faith.

 d. That Sentinel is entitled to the appointment of Wesley Barber as umpire (or, in the alternative, another competent and impartial umpire).

 e. That the appraisers (Lupfer and Coleman) and umpire (to be appointed by the Court) appraise the entire loss to the Building caused by the hail, including but not limited to the Roofing System Damage and Other Damage, with any other coverage issues to be resolved by the Court.

 f. That Webber is entitled to recover reasonable attorneys' fees and costs.

(4) for any such other and further relief as this Court shall deem just and proper.

Respectfully Submitted,

s/ William M. Wilson III
William M. Wilson III (S.C. Bar No. 15808)
WYCHE, P.A.
200 East Camperdown Way (29601)
Post Office Box 728
Greenville, South Carolina  29602
Telephone:  864-242-8200
Telecopier:  864-235-8900
bwilson@wyche.com

Date:  August 11, 2021  Attorneys for Webber Ventures, LLC